UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* HUMBERTO IRIZARRY,<br><br>*Plaintiff*,<br><br>v.<br><br>INNOVATIVE TECHNOLOGIES, INC., *et al.*,<br><br>*Defendants*. | Civil Action No. 13-705 (LLA) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff-Relator Humberto Irizarry brought this *qui tam* action against his former employer, Innovative Technologies, Inc. ("ITI"), ITI's CEO Mariano Martinez, and Mr. Martinez's wife, Theresa Martinez (collectively, "Defendants"). ECF No. 20. Defendants have moved to dismiss Mr. Irizarry's whistleblower retaliation claim (Count III). ECF No. 54. For the reasons explained below, the court will grant Defendants' motion.

**I.  Factual Background**

In resolving Defendants' motion to dismiss, the court accepts the following factual allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). ITI is a government contractor that, as relevant to this suit, provides audio-visual equipment and services to the U.S. Department of Defense ("DOD"). ECF No. 20 ¶¶ 4, 13; ECF No. 40 ¶ 2. Mr. Martinez is the company's founder and Chief Executive Officer. ECF No. 20 ¶ 21. Mr. Irizarry worked for ITI from 2001 to 2012. *Id.* ¶ 8. At the time this matter arose, he was ITI's Vice President for Visual Integration Services and Senior Program Manager for DOD contracts. *Id.*

On May 14, 2012, Mr. Martinez met with Mr. Irizarry to "discuss performing an internal audit" of ITI's contracts. *Id.* ¶ 71. The purpose of the audit was to determine whether ITI's contracts were subject to the Service Contract Act ("SCA"), 41 U.S.C. § 6701 *et seq.*, and, if so, whether ITI had complied with the SCA, ECF No. 20 ¶ 71. The SCA "establishes minimum labor standards for service[s] provided by private contractors to the United States." ECF No. 20 ¶ 33; *see* 41 U.S.C. § 6703. If a contract falls within the SCA's scope, the contractor must pay its employees a minimum hourly wage and certain fringe benefits. ECF No. 20 ¶¶ 34-35; *see* 41 U.S.C. § 6703(1)-(2).

On May 15, another ITI employee—Vincent Langan—emailed Mr. Martinez confirming that a particular contract (Contract No. HQ0028-07-D-0003) ("the Contract") was subject to the SCA. ECF No. 20 ¶¶ 72-73. Later that afternoon, Mr. Martinez "ignore[ed] [Mr. Irizarry's] requests that the company hire an attorney to conduct the investigation" and ordered him to continue handling it. *Id.* ¶ 74. Mr. Irizarry did, and he discovered that ITI had violated the SCA by underpaying its employees more than $1.15 million over the life of the Contract. *Id.* ¶¶ 75-79. That "calculation did not include fringe benefits or subcontractors," *id.* ¶ 78, meaning that the total underpayment in violation of the SCA was even higher.

Mr. Irizarry presented his findings to Mr. Martinez on May 17. *Id.* ¶ 77. Mr. Martinez "became infuriated, and revealed to [Mr. Irizarry] that Defendants were non-compliant with SCA wage requirements on nearly every contract it performed within the last twenty (20) years." *Id.* ¶ 80. He also told Mr. Irizarry that ITI had billed the federal government for labor performed on the Contract at hourly rates *above* the minimum SCA wage, even though it was paying its employees less than the SCA required, and it had pocketed the difference. *Id.* ¶¶ 82, 85. Thus, when Defendants submitted Contract invoices to the government, they had falsely certified that

they were complying with the SCA and paying employees appropriately.  *Id.* ¶ 83.  Mr. Irizarry suggested, again, that Mr. Martinez hire an attorney and encouraged him to refund the overpayments to the government.  *Id.* ¶ 86.  Mr. Martinez refused to "self-report."  *Id.*

On June 7, Mr. Martinez asked Mr. Irizarry to arrange a meeting with two subcontractors, Aerotek and MSI, which ITI was using to fulfill the Contract.  *Id.* ¶ 87.  Mr. Martinez told Mr. Irizarry that the purpose of the meeting was "to obtain information and documentation related to wages the subcontractors paid to their employees for work performed on the Contract."  *Id.* ¶ 88.  The SCA requires contractors to ensure that their subcontractors comply with the Act's labor standards.  *Id.* ¶ 47; *see* 29 C.F.R. § 4.114(b).  Mr. Irizarry told Mr. Martinez that he "felt uncomfortable organizing such a meeting, as he felt that this meeting was an attempt to hide, rather than correct, any past SCA violations."  ECF No. 20 ¶ 88.  Mr. Martinez nonetheless instructed Mr. Irizarry to arrange the meeting.  *Id.*  Because Mr. Irizarry did not want to participate in any potentially illegal activity, he asked Mr. Langan to organize the meeting instead.  *Id.*

That same day, a DOD component awarded ITI a $100-million contract (Contract No. HQ0028-12-D-0011) (the "T-ASA Contract").  *Id.* ¶¶ 89-90.  Mr. Martinez asked Mr. Irizarry to review the contract before signing it.  *Id.* ¶ 91.  Rather than provide Mr. Irizarry the password to the computer software ITI used for contracting (to which Mr. Irizarry normally had access), Mr. Martinez insisted that they review the contract together in a conference room.  *Id.*  During the review, Mr. Irizarry realized that the new proposal and contract did not comply with the SCA.  *Id.* ¶ 92.  Mr. Martinez told Mr. Irizarry "that he understood that the proposal had defective pricing and was not compliant with the SCA," that ITI "needed the work, and that he (Martinez) needed to do everything possible to ensure . . . ITI was awarded the new contract."  *Id.* ¶¶ 93, 95.

3

Before signing the contract, Mr. Martinez and Mr. Irizarry participated in a conference call with Contract Administrator Jessie Feliciano. *Id.* ¶ 96. Mr. Martinez "limited [Mr. Irizarry's] dialogue during the conference call, prohibiting him from raising the issue of the defective pricing." *Id.* ¶ 97. After the call, Mr. Martinez told Mr. Irizarry, "I do not have another choice than to sign the contract," and he said that "his only concern was to ensure that no issues were raised by the Government[] or other bidders within the next 10 days that covered the protest period." *Id.* Mr. Martinez also stated that he "would ask for a contract modification to fix the SCA compliance issue and would blame [the Department of Labor] for the request," but Mr. Irizarry does not believe that Mr. Martinez ever did so. *Id.*

On June 8, Mr. Martinez emailed Mr. Irizarry and "asked to discuss [his] progress" in arranging the subcontractor meeting. *Id.* ¶ 98. On June 11, Mr. Martinez sent a second email asking about the status of the meeting and requesting that Mr. Irizarry meet with him to "discuss [his] handling of the internal investigation." *Id.* ¶ 99. The two met that evening. *Id.* ¶ 100. Mr. Irizarry told Mr. Martinez that he had not reached out to the subcontractors and had instead asked Mr. Langan to set up the meeting. *Id.* ¶ 101. Mr. Martinez "demanded that [Mr. Irizarry] conduct the meeting." *Id.* Mr. Irizarry "refused, and repeated his concerns that such a meeting would constitute furthering [Defendants'] unlawful acts." *Id.* Mr. Martinez became angry and told Mr. Irizarry that he "did not care about the potential illegal activity" and that Mr. Irizarry should "do what he was told." *Id.* ¶ 102. When Mr. Irizarry again refused, Mr. Martinez told him, "[o]n Friday we will meet to discuss your future in this company." *Id.* ¶ 103.

About five minutes later, Mr. Martinez came into Mr. Irizarry's office and asked him to come to a conference room "so that they could discuss [his] future at ITI." *Id.* ¶ 104. Mr. Martinez told Mr. Irizarry that "things are not working out with you." *Id.* ¶ 105. Mr. Irizarry "understood

4

this to mean that he only had two options: either follow Martinez's orders and engage in activity that [he] reasonably believed to be illegal, or resign." *Id.*  Mr. Irizarry "handed in his resignation and explained that he felt [Mr.] Martinez was demanding that he violate federal law." *Id.* ¶ 106. Mr. Martinez instructed him to leave ITI immediately. *Id.*

The next morning, Mr. Irizarry met with ITI's Human Resources Manager. *Id.* ¶ 107.  He provided a copy of his resignation letter, "informed [the manager] that he resigned because of [Mr.] Martinez's instruction and pressure to participate in illegal conduct," and told the manager that Mr. Martinez had violated federal contracting laws by submitting defective pricing information for the T-ASA Contract. *Id.* ¶¶ 107-09.

On June 13, Mr. Irizarry called Mr. Feliciano and told him that ITI's "proposal for [the T-ASA Contract] was not SCA-compliant and included defective pricing." *Id.* ¶ 110.  Mr. Irizarry explained that he had resigned from ITI because of the SCA violations and because Mr. Martinez had created a hostile work environment by demanding that he participate in illegal activity. *Id.* ¶ 112.  In February 2013, Mr. Irizarry voluntarily disclosed Defendants' fraudulent activity to the government. *Id.* ¶ 116.

## II.     Procedural History

Mr. Irizarry filed this *qui tam* action in May 2013, alleging that Defendants violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by fraudulently certifying compliance with the SCA (Counts I & II) and by concealing false claims for certain equipment fees (Count IV); retaliated against him for engaging in activity protected by the False Claims Act (Count III); and breached his employment contract by failing to pay him roughly $82,000 in wages and commission (Count V). ECF No. 1 ¶¶ 235-85.  The United States requested and received multiple extensions of time to decide whether to intervene. ECF Nos. 4-19, 21-36.  During this period, Mr. Irizarry

5

amended his complaint. ECF No. 20. In September 2023, the United States filed a complaint in partial intervention, intervening only as to Count IV.[1] ECF No. 40; *see* ECF No. 37. Mr. Irizarry filed a notice of partial voluntary dismissal, asking that the non-intervened *qui tam* counts (Counts I & II) and all claims against Mr. Martinez's wife be dismissed without prejudice. ECF No. 41.

Defendants moved to dismiss Mr. Irizarry's whistleblower retaliation claim (Count III). ECF No. 54. The motion is now fully briefed. ECF Nos. 56, 57.

### III.   Legal Standard

Defendants move to dismiss Mr. Irizarry's retaliation claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 54. Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss under Rule 12(b)(6), the court will accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

### IV.   Discussion

"The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, imposes civil liability on any person who presents false or fraudulent claims for payment to the Federal Government." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023). Section 3730(h) of the statute protects "whistleblowers who seek to expose or to prevent government fraud."

---

[1] The United States' complaint in intervention superseded Count IV of Mr. Irizarry's complaint. *See United States ex rel. Sansbury v. LB & B Assocs.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014).

*Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019).  To make out a retaliation claim under the False Claims Act, "a plaintiff must plead facts showing (i) that []he engaged in protected activity, (ii) 'because of' which []he was retaliated against."  *Id.* (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).

"Protected activity under the False Claims Act's anti-retaliation provision takes two forms."  *Singletary*, 939 F.3d at 295.  The first form of protected activity is "lawful acts done . . . in furtherance of an action under this section," 31 U.S.C. § 3730(h)(1)—in other words, "steps taken antecedent to a False Claims Act proceeding," *Singletary*, 939 F.3d at 295.  An employee engages in such activity by "'investigat[ing] matters that reasonably could lead to,' or have a 'distinct possibility' of leading to, a 'viable False Claims Act case.'"  *Id.* (quoting *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66, 68-69 (D.C. Cir. 2008)).  The second form of protected activity is "lawful acts done in furtherance of 'other efforts to stop 1 or more violations of' the [Act]."  *Singletary*, 939 F.3d at 295 (quoting 31 U.S.C. § 3730(h)(1)).  "To put it simply, the focus of the second prong is preventative—stopping 'violations'—while the first prong is reactive to an (alleged) actual violation of the statute."  *Id.* at 296.

Mr. Irizarry's alleged protected activity fall into two categories: (1) his investigation of ITI's SCA violations and the statements he made to Mr. Martinez about the results and consequences of that investigation; and (2) his refusal to organize or participate in the meeting with ITI's subcontractors.[2]  *See* ECF No. 56, at 13-16.  Per Mr. Irizarry, Defendants constructively

---

[2] Mr. Irizarry also claims that he engaged in protected activity by "inform[ing] ITI's HR manager that ITI submitted defective contracts in violation of federal contracting laws and [that] he resigned because of Martinez's instruction and pressure to participate in illegal conduct."  ECF No. 56, at 14; *see* ECF No. 20 ¶¶ 107-09.  But he did so *after* he had already decided to resign—after the alleged adverse employment action.  *See* ECF No. 20 ¶¶ 106-09.  There can therefore be no plausible causal link between Mr. Irizarry's disclosure to the Human Resources manager and the alleged adverse employment action.

discharged him because he engaged in those activities. *Id.* at 10-11.  The court concludes that neither of Mr. Irizarry's alleged protected activities can support his retaliation claim.[3]

### A. Investigation and Related Comments

Investigating a matter that could lead to a viable False Claims Act case is a protected activity.  *Singletary*, 939 F.3d at 295.  But "[c]ommon sense teaches that an employer cannot retaliate against conduct of which it was unaware."  *Id.* at 300.  Thus, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice."  *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)).

The parties dispute whether Mr. Irizarry was acting within the scope of his "normal job responsibilities" when he investigated ITI's SCA violations and followed up on the results of that investigation by encouraging Mr. Martinez to hire an attorney and suggesting that ITI refund the government.  *See* ECF No. 54, at 8-10; ECF No. 56, at 13-14; ECF No. 20 ¶¶ 74, 86, 88, 101.  Mr. Irizarry argues that, as Vice President for Visual Integration Services, his job was merely to oversee the implementation and completion of ITI's contracts.  ECF No. 56, at 13; *see* ECF No. 20 ¶ 8.  He contends that he "did not have any responsibility to investigate nor ensure that ITI's contracts were compliant with any laws or regulations"—instead, that was the role of ITI's contract managers, its accounting department, and Mr. Martinez himself.  ECF No. 56, at 13; *see*

---

[3] Because the court finds that Mr. Irizarry cannot meet the protected activity requirement, the court need not consider Defendants' arguments that (1) he never suffered any adverse employment action and (2) the court should dismiss his claim against Mr. Martinez because the False Claims Act does not allow for retaliation claims against individuals.  ECF No. 54, at 1-2.

ECF No. 20 ¶¶ 10-11. But this is beside the point, because Mr. Irizarry admits that he only investigated ITI's SCA violations because Mr. Martinez ordered him to. ECF No. 20 ¶¶ 71-79. Mr. Martinez made the SCA investigation part of Mr. Irizarry's job responsibilities by asking him to conduct it.

Because Mr. Irizarry was "simply performing his ordinary duties" when he investigated ITI's SCA violations, there is a presumption that such activities cannot support a whistleblower retaliation claim. *See Martin-Baker Aircraft Co.*, 389 F.3d at 1261 (quoting *Yuhasz*, 341 F.3d at 568). To overcome that presumption, Mr. Irizarry must "act[] outside his normal job responsibilities or alert[] a party outside the usual chain of command." *Id.* He did not do so. As already discussed, Mr. Irizarry did not act outside his normal job responsibilities—he merely did as he was told. ECF No. 20 ¶¶ 71-79. And Mr. Irizarry reported his concerns only to Mr. Martinez, not outside his chain of command.[4] *Id.* ¶¶ 77, 86, 88.

Although it is a closer question, the same logic applies to Mr. Irizarry's internal complaints to Mr. Martinez. Mr. Irizarry alleges that he "made protected disclosures" by "request[ing] Martinez . . . hire an attorney to conduct the investigation" and "urg[ing] Martinez to refund the overpayments to the Government." ECF No. 56, at 14. While Mr. Martinez did not specifically ask Mr. Irizarry to opine on the consequences of the internal investigation or who should conduct it, those conversations were the natural result of Mr. Martinez's order that Mr. Irizarry investigate ITI's SCA violations. *Yuhasz* provides a helpful analogy. 341 F.3d at 561. There, the plaintiff— who was hired to supervise laboratory testing and submit certifications of compliance—argued

---

[4] Even if the investigation itself was protected activity, Mr. Irizarry does not seem to allege that ITI constructively discharged him merely because he conducted the investigation. Rather, he alleges that he was pushed out of ITI because of what he did *after* he conducted the investigation. *See* ECF No. 56, at 12. Thus, even if the investigation itself was protected activity, there would be no plausible causal connection between that investigation and any adverse employment action.

that he had engaged in protected activity by "informing [the defendant] that its certifications were illegal and that other companies had incurred liability under the FCA for false claims." *Id.* at 567. Of course, the plaintiff had not been specifically hired to tell the defendant that it was breaking the law, but the court nonetheless concluded that the reports in question were "entirely within the scope of his duties." *Id.* "[M]erely warning the defendants of the consequences of their conduct," as Mr. Irizarry did here, did not necessarily put Defendants on notice that he "was furthering or intending to further an FCA action." *Id.* (quoting *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996)). And again, Mr. Irizarry has not alleged that he reported his concerns outside his chain of command. *Cf. Singletary*, 939 F.3d at 301-02 (holding that the plaintiff engaged in protected activity by reporting violations to both her supervisors and the federal government).

In sum, Mr. Irizarry has not plausibly alleged that Defendants were on notice that, by investigating ITI's SCA violations and discussing the consequences of that investigation with Mr. Martinez, he was taking steps in furtherance of a False Claims Act action. Those actions thus cannot support a whistleblower retaliation claim.

### B.     Refusal to Participate in the Subcontractor Meeting

Mr. Irizarry also contends that he engaged in protected activity by "refus[ing] to conduct a meeting with the subcontractors because he reasonably believed that the meeting . . . would require him to participate in the illegal concealment of fraud" and by telling Mr. Martinez so. ECF No. 56, at 15. He concedes, however, that "a refusal to participate alone does not constitute a protected activity" under the False Claims Act. *Id.* at 14. As then-Judge Ketanji Brown Jackson explained in *United States ex rel. Tran v. Computer Sciences Corporation*, 53 F. Supp. 3d 104 (D.D.C. 2014), the plain text of the False Claims Act requires "affirmative activity": "acts done" or "efforts taken" to stymie fraud. *Id.* at 136; *see* 31 U.S.C. § 3730(h)(1). "With rare exception, the mere refusal to

participate in an allegedly unlawful scheme is neither an 'act[] done' nor an 'effort[]' taken, and such forbearance certainly does not equate with the kind of affirmative activity that the text of the statute conveys." *Tran*, 53 F. Supp. 3d at 136 (alterations in original).

Instead, Mr. Irizarry argues that his "refusal to participate coupled with additional activity to stop the alleged fraud . . . constitutes protected activity." ECF No. 56, at 14. It is true that "when courts assessing [False Claims Act] retaliation claims have mentioned with some approval a relator's refusal to participate in a fraudulent scheme, that fact is inevitably coupled with actual actions that the relator took either to promote its [False Claims Act] suit[] or to stop the alleged fraud." *Tran*, 53 F. Supp. 3d at 136. The problem for Mr. Irizarry, however, is that, as explained above, his actions could not have put Defendants on notice that he was engaging in protected activity. *See supra* Part IV(A). In each of the cases Mr. Irizarry cites, the relator took some *other* action—in addition to refusing to participate in allegedly unlawful activity—that could independently support a retaliation claim. *See* ECF No. 56, at 15 (citing cases relied on in *Tran*); *see, e.g.*, *Sharma v. District of Columbia*, 791 F. Supp. 2d 207, 219 (D.D.C. 2011) ("Plaintiff went beyond the management chain . . . to complain by filing two formal complaints with the U.S. Department of Justice."); *United States ex rel. Hood v. Satory Glob., Inc.*, 946 F. Supp. 2d 69, 87 (D.D.C. 2013) (allowing a False Claims Act retaliation claim to proceed where the relators had reported their concerns outside their chain of command).[5]

---

[5] The same is true of the out-of-circuit cases that Mr. Irizarry cites. ECF No. 56, at 15 (citing *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988 (D. Minn. 2013), *aff'd*, 823 F.3d 462 (8th Cir. 2016); *United States ex rel. Meyer v. Kempf Surgical Appliances, Inc.*, No. 11-CV-111, 2013 WL 1438025 (S.D. Ohio Apr. 9, 2013); *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597 (S.D. Tex. 2012)). In all three, the plaintiffs either engaged in activity that had little to do with their job description or reported outside their chain of command. *Elkharwily*, 955 F. Supp. 2d at 994 (allowing a claim to proceed where the plaintiff "participated in activity outside of his job description"); *United States ex rel. Meyer*, 2013 WL 1438025, at *1 (allowing a claim to proceed where the relator, a "licensed orthotist"—in other words, a healthcare provider, not a

Because Mr. Irizarry's refusal to participate in the subcontractor meeting and his statements to Mr. Martinez explaining that refusal do not constitute protected activity under the False Claims Act, and because Mr. Irizarry has not plausibly alleged any other instances of protected activity, the court will dismiss his whistleblower retaliation claim.

### V.     Conclusion

In light of Relator's Notice of Partial Voluntary Dismissal, ECF No. 41, it is hereby **ORDERED** that Counts I and II of Relator's Amended Complaint and all claims against Defendant Theresa Martinez are hereby **DISMISSED** without prejudice to the Relator and without prejudice as to the United States.  For the foregoing reasons, it is further **ORDERED** that Defendants' Motion to Dismiss Relator's Claim for Whistleblower Retaliation, ECF No. 54, is **GRANTED** and Count III is **DISMISSED**.  Counts IV and V of Relator's Amended Complaint, ECF No. 20, and the United States' Complaint in Partial Intervention, ECF No. 40, remain before the court.  The court will schedule an Initial Scheduling Conference forthwith.

                   **SO ORDERED.**

                   /s/ Loren L. AliKhan
                   LOREN L. ALIKHAN
                   United States District Judge

Date: September 30, 2024

---

compliance or billing specialist—"raised questions about Defendants' billing practices"); *United States ex rel. George*, 864 F. Supp. 2d at 600, 609 (allowing a claim to proceed where the relator, a sales representative, inquired about the legality of the defendant's activity "at large company presentations" where many employees were present).