## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| UNITED STATES OF AMERICA *ex rel.* HUMBERTO IRIZARRY, <br><br>           *Plaintiff*, <br><br>    v. <br><br> INNOVATIVE TECHNOLOGIES, INC., *et al.*, <br><br>           *Defendants*. |

Civil Action No. 13-705 (LLA)

### <u>MEMORANDUM OPINION AND ORDER</u>

In November 2024, the court dismissed Plaintiff-Relator Humberto Irizarry's whistleblower retaliation claim against his former employer, Innovative Technologies, Inc. ("ITI") and ITI's CEO Mariano Martinez. ECF No. 58. Mr. Irizarry now moves for leave to file a second amended complaint. ECF No. 59. The motion is fully briefed. ECF Nos. 59 to 61. For the reasons explained below, the court denies the motion.

### I.     FACTUAL BACKGROUND

In resolving Mr. Irizarry's motion to amend, the court accepts the following factual allegations, drawn from Mr. Irizarry's proposed second amended complaint, as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

ITI is a government contractor that, as relevant to this suit, provides audio-visual equipment and services to the U.S. Department of Defense ("DOD"). ECF No. 59-1 ¶¶ 4, 15-18. Mr. Martinez is the company's founder and Chief Executive Officer. *Id.* ¶ 23. Mr. Irizarry worked for ITI from 2001 to 2012. *Id.* ¶ 8. At the time this matter arose, he was ITI's Vice President for

Visual Integration Services and Senior Program Manager for DOD contracts. *Id.* Mr. Irizarry's regular job duties and responsibilities did not include legal compliance work pertaining to the DOD contracts. ECF No. 59 ¶¶ 12-14.

On May 14, 2012, Mr. Martinez met with Mr. Irizarry to "discuss performing an internal audit" of ITI's contracts. *Id.* ¶ 72. The purpose of the audit was to determine whether ITI's contracts were subject to the Service Contract Act ("SCA"), 41 U.S.C. § 6701 *et seq.*, and, if so, whether ITI had complied with the SCA, ECF No. 59-1 ¶ 72. The SCA "establishes minimum labor standards for service[s] provided by private contractors to the United States." ECF No. 59-1 ¶ 34; *see* 41 U.S.C. § 6703. If a contract falls within the SCA's scope, the contractor must pay its employees a minimum hourly wage and certain fringe benefits. ECF No. 59-1 ¶¶ 33-36; *see* 41 U.S.C. § 6703(1)-(2).

On May 15, another ITI employee—Vincent Langan—emailed Mr. Martinez confirming that a particular contract (Contract No. HQ0028-07-D-0003) ("the Contract") was subject to the SCA. ECF No. 59-1 ¶¶ 73-74. Later that afternoon, Mr. Martinez "ignor[ed] [Mr. Irizarry's] requests that the company hire an attorney to conduct the investigation" and ordered him to become "well versed" in the SCA, Fair Labor Standards Act, and the Davis-Bacon Act; investigate whether ITI had violated the SCA; and, if so, determine the extent of the violation. *Id.* ¶ 75. ITI had never before tasked Mr. Irizarry with investigating potential violations of legal and compliance obligations. *Id.* ¶ 76. When Mr. Irizarry asked Mr. Martinez to send him the assignment in writing, Mr. Martinez sent Mr. Irizarry an email that said only "Compliance Review, 'FYA,'" and instructed Mr. Irizarry to share the results of his investigation with no one other than him. *Id.* Mr. Irizarry protested that "Contract Manager Vincent Langan or HR Manager Beth Carroll would be better suited for such an investigation as Mr. Langan was more familiar with the contracts and

Ms. Carroll was responsible for preparing employees' salaries for the audit"; in response, Mr. Martinez explained that he trusted only Mr. Irizarry to "keep things quiet." *Id.* ¶ 77.

Mr. Irizarry conducted his investigation and discovered that ITI had violated the SCA by underpaying its employees more than $1.15 million over the life of the Contract. *Id.* ¶¶ 78-82. That "calculation did not include fringe benefits or subcontractors," *id.* ¶ 81, meaning that the total underpayment in violation of the SCA was even higher.

Mr. Irizarry compiled his findings in an Excel report that he presented to Mr. Martinez on May 17. *Id.* ¶ 80. Mr. Martinez "became infuriated, and revealed to [Mr. Irizarry] that Defendants were non-compliant with SCA wage requirements on nearly every contract it performed within the last twenty (20) years." *Id.* ¶ 83. He also told Mr. Irizarry that ITI had billed the federal government for labor performed on the Contract at hourly rates *above* the minimum SCA wage, even though it was paying its employees less than the SCA required, and it had pocketed the difference. *Id.* ¶¶ 85, 88. Thus, when Defendants submitted Contract invoices to the government, they had falsely certified that they were complying with the SCA and paying employees appropriately. *Id.* ¶ 86. Mr. Irizarry suggested, again, that Mr. Martinez hire an attorney and encouraged him to refund the overpayments to the government. *Id.* ¶ 89. Mr. Martinez refused to "self-report." *Id.*

On June 7, Mr. Irizarry attended a meeting with Mr. Martinez, Mr. Langan, and Ms. Carroll; at the meeting, Mr. Martinez forbade the three employees from communicating with the Department of Labor ("DOL") directly concerning its investigation into ITI. *Id.* ¶ 90.[1] Instead, Mr. Martinez explained that any communication with the DOL should go through him and ITI's legal counsel, Andrew P. Hallowell. *Id.* Mr. Martinez had previously explained to Mr. Irizarry

---

[1] Mr. Irizarry does not explain when the DOL opened its investigation.

that he "wanted to control all the information disseminated to [DOL] Investigator Yasin and Attorney Hallowell in an effort to prevent Investigator Yasin and Attorney Hallowell from learning any information related to ITI's wrongdoing." *Id.* ¶ 91.

Later that day, Mr. Martinez asked Mr. Irizarry to arrange a meeting with two subcontractors, Aerotek and MSI, which ITI was using to fulfill the Contract. *Id.* ¶ 92. Mr. Martinez told Mr. Irizarry that the purpose of the meeting was "to obtain information and documentation related to wages the subcontractors paid to their employees for work performed on the Contract." *Id.* ¶ 93. The SCA requires contractors to ensure that their subcontractors comply with the Act's labor standards. *Id.* ¶ 48; *see* 29 C.F.R. § 4.114(b). Mr. Irizarry told Mr. Martinez that he "felt uncomfortable organizing such a meeting, as he felt that this meeting was an attempt to hide, rather than correct, any past SCA violations and he believed it would interfere with DOL's investigation." ECF No. 59-2 ¶ 93. Mr. Martinez nonetheless instructed Mr. Irizarry to arrange the meeting, telling Mr. Irizarry that he "was not stupid" and that he should "disguise the meeting as a routine business meeting" so that the DOL investigator would not find out. *Id.* Because Mr. Irizarry did not want to participate in any potentially illegal activity, he refused to set up the meeting and asked Mr. Langan to organize the meeting instead. *Id.*

That same day, a DOD component awarded ITI a $100-million contract (Contract No. HQ0028-12-D-0011) (the "T-ASA Contract"). *Id.* ¶¶ 94-95. Mr. Martinez asked Mr. Irizarry to review the contract before signing it. *Id.* ¶ 96. Rather than provide Mr. Irizarry the password to the computer software ITI used for contracting (to which Mr. Irizarry normally had access), Mr. Martinez insisted that they review the contract together in a conference room. *Id.* During the review, Mr. Irizarry realized that the new proposal and contract did not comply with the SCA. *Id.* ¶ 97. Mr. Martinez told Mr. Irizarry "that he understood that the proposal had defective pricing

and was not compliant with the SCA," that ITI "needed the work, and that he (Martinez) needed to do everything possible to ensure . . . ITI was awarded the new contract." *Id.* ¶¶ 98, 100.

Before signing the contract, Mr. Martinez and Mr. Irizarry participated in a conference call with Contract Administrator Jessie Feliciano. *Id.* ¶¶ 101, 126. Mr. Martinez "limited [Mr. Irizarry's] dialogue during the conference call, prohibiting him from raising the issue of the defective pricing." *Id.* ¶ 102. After the call, Mr. Martinez told Mr. Irizarry, "I do not have another choice than to sign the contract," and he said that "his only concern was to ensure that no issues were raised by the Government[] or other bidders within the next 10 days that covered the protest period." *Id.* Mr. Martinez also stated that he "would ask for a contract modification to fix the SCA compliance issue and would blame DOL for the request," but Mr. Irizarry does not believe that Mr. Martinez ever did so. *Id.*

On June 8, Mr. Martinez emailed Mr. Irizarry and "asked to discuss [his] progress" in arranging the subcontractor meeting. *Id.* ¶ 103. On June 11, Mr. Martinez sent a second email asking about the status of the meeting and separately requesting that Mr. Irizarry meet with him to "discuss [his] handling of the internal investigation." *Id.* ¶ 104. Later that day, Mr. Irizarry, Mr. Martinez, and several other ITI employees met with DOL Investigator Dilshad Yasin. *Id.* ¶ 105. When Mr. Irizarry asked why so many employees were at the meeting, Mr. Martinez explained that "he was attempting to intimidate Investigator Yasin." *Id.* At the meeting, Mr. Martinez "falsely described specific duties of ITI technicians covered by the SCA and downplayed their daily work tasks in an effort to mislead Investigator Yasin." *Id.* ¶ 106. After the meeting, Mr. Martinez saw Mr. Irizarry speaking to Investigator Yasin and exchanging contact information with him. *Id.* ¶ 107.

After Investigator Yasin left, Mr. Martinez told Mr. Irizarry that he was a "punk" that "want[ed] to make a name for himself in the DOL by bringing [Mr. Martinez] down." *Id.* ¶ 108. Mr. Irizarry responded that Mr. Martinez had "falsely described the job duties of ITI technicians to Investigator Yasin" and warned him that "misleading Investigator Yasin was not a good idea." *Id.* ¶ 109. Mr. Martinez told Mr. Irizarry that he was "revising job descriptions to avoid DOL detection." *Id.* ¶ 110. In response, Mr. Irizarry pointed to the example of President Nixon, stating that "the cover up is worse than the crime" and that Mr. Martinez should "not do it." *Id.* ¶ 111. The conversation concluded with Mr. Martinez instructing Mr. Irizarry to meet him at 5:00 p.m. that evening. *Id.* ¶¶ 112, 116.

When the two met that evening, Mr. Irizarry told Mr. Martinez that he had not reached out to the subcontractors and had instead asked Mr. Langan to set up the meeting. *Id.* ¶ 117. Mr. Martinez "demanded that [Mr. Irizarry] conduct the meeting." *Id.* Mr. Irizarry "refused, and repeated his concerns that such a meeting would constitute furthering [Defendants'] unlawful acts." *Id.* Mr. Martinez became angry and told Mr. Irizarry that he "did not care about the potential illegal activity" and that Mr. Irizarry should "do what he was told." *Id.* ¶ 118. When Mr. Irizarry again refused, Mr. Martinez told him, "[o]n Friday we will meet to discuss your future in this company." *Id.* ¶ 119.

About five minutes later, Mr. Martinez came into Mr. Irizarry's office and asked him to come to a conference room "so that they could discuss [his] future at ITI." *Id.* ¶ 120. Once there, Mr. Martinez told Mr. Irizarry that "things are not working out with you." *Id.* ¶ 121. Mr. Irizarry "understood [this] to mean that he only had two options: either follow [Mr.] Martinez's orders and engage in activity that [he] reasonably believed to be illegal, or resign." *Id.* Mr. Irizarry "handed

in his resignation and explained that he felt [Mr.] Martinez was demanding that he violate federal law." *Id.* ¶ 122.  Mr. Martinez instructed him to leave ITI immediately.  *Id.*

The next morning, Mr. Irizarry met with ITI's Human Resources Manager.  *Id.* ¶ 123.  He provided a copy of his resignation letter, "informed [the manager] that he resigned because of [Mr.] Martinez's instruction and pressure to participate in illegal conduct," and told the manager that Mr. Martinez had violated federal contracting laws by submitting defective pricing information for the T-ASA Contract.  *Id.* ¶¶ 124-25.

On June 13, Mr. Irizarry called Mr. Feliciano, the Contract Administrator, and told him that ITI's "proposal for [the T-ASA Contract] was not SCA-compliant and included defective pricing."  *Id.* ¶ 126.  Mr. Irizarry explained that he had resigned from ITI because of the SCA violations and because Mr. Martinez had created a hostile work environment by demanding that he participate in illegal activity.  *Id.* ¶ 128.

On June 15, Mr. Irizarry participated in an interview with Investigator Yasin regarding the DOL's investigation into ITI.  *Id.* ¶ 113.  During the interview, Mr. Irizarry "fully cooperated and reported everything he discovered in his investigation of the Contract to Investigator Yasin."  *Id.* ¶ 113.  Over the next several months, Mr. Irizarry assisted Investigator Yasin with his investigation, including by providing him with copies of documents and "insight and clarity into ITI's policies and practices."  *Id.* ¶ 114.  In February 2013, Mr. Irizarry voluntarily disclosed Defendants' fraudulent activity to the government.  *Id.* ¶ 132.

## II.    PROCEDURAL HISTORY

Mr. Irizarry filed this *qui tam* action in May 2013, alleging that Defendants violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by fraudulently certifying compliance with the SCA (Counts I & II) and by concealing false claims for certain equipment fees (Count IV); retaliated

against him for engaging in activity protected by the False Claims Act (Count III); and breached his employment contract by failing to pay him wages and commission that he was owed (Count V). ECF No. 1 ¶¶ 235-85.  The United States requested and received multiple extensions of time to decide whether to intervene.  ECF Nos. 4-19, 21-36.  During this period, Mr. Irizarry twice amended his complaint.  ECF Nos. 2, 20.  In September 2023, the United States filed a complaint in partial intervention, intervening only as to Count IV.[2]  ECF No. 40; *see* ECF No. 37. Mr. Irizarry filed a notice of partial voluntary dismissal, asking that the non-intervened *qui tam* counts (Counts I & II) and all claims against Mr. Martinez's wife—who had initially been named as a defendant—be dismissed without prejudice.  ECF No. 41.

In February 2024, Defendants moved to dismiss Mr. Irizarry's whistleblower retaliation claim (Count III).  ECF No. 54.  In September 2024, the court granted Defendants' motion to dismiss, finding that Mr. Irizarry had not stated a claim of retaliation because he had failed to plausibly allege that he engaged in protected activity.  ECF No. 58, at 12.  In November 2024, Mr. Irizarry filed a motion for leave to file a second amended complaint.  ECF No. 59.  The motion is now fully briefed.  ECF Nos. 59 to 61.

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 15, a party may amend its pleading once as a matter of course, and thereafter "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a).  "[O]ne count of a complaint which includes multiple claims may be amended as of right or by leave of court after a trial judge has dismissed the count but before

---

[2] The United States' complaint in intervention superseded Count IV of Mr. Irizarry's complaint. *See United States ex rel. Sansbury v. LB & B Assocs.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014).

the dismissal has become final under Rule 54(b)."  *Cassell v. Michaux*, 240 F.2d 406, 407 (D.C. Cir. 1956).

The court should freely grant such leave "when justice so requires."  *Id.*  "[T]he grant or denial of leave to amend is committed to a district court's discretion."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  However, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by [previous] amendments . . . [or] futility of amendment.'"  *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Amendment is futile "if the proposed claim would not survive a motion to dismiss."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).  This is typically the case when the amendment "merely restates the same facts" or "fails to state a legal theory."  *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002).  "[U]nder Rule 15, 'the non-movant generally carries the burden in persuading the court to deny leave to amend.'"  *In Lux Rsch. v. Hull McGuire PC*, No. 23-CV-523, 2023 WL 8190821, at *2  (D.D.C. Nov. 27, 2023) (quoting *Nwachukwu v. Karl*, 222 F.R.D. 208, 211 (D.D.C. 2004)).

## IV.    DISCUSSION

The court previously granted Defendants' motion to dismiss, determining that Mr. Irizarry could not sustain his retaliation claim because he had not pleaded facts indicating that he had engaged in protected activity.   ECF No. 58.   Mr. Irizarry now moves to amend, seeking to (1) "provide details showing that [he] acted outside his ordinary job duties," ECF No. 59, at 2; (2) "add facts evidencing that [his] reports to Defendant Martinez put Defendants on notice," *id.* at 4;  and  (3) "add  facts . . . [showing  that]  his  refusal  to  schedule  and  participate  in  the

subcontractor meeting is a protected activity," *id.* at 7.   The court concludes that none of Mr. Irizarry's additional allegations can save his retaliation claim.

"The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, imposes civil liability on any person who presents false or fraudulent claims for payment to the Federal Government." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023).   Section 3730(h) of the statute protects "whistleblowers who seek to expose or to prevent government fraud." *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019).   To make out a retaliation claim under the False Claims Act, "a plaintiff must plead facts showing (i) that []he engaged in protected activity, (ii) 'because of' which []he was retaliated against." *Id.* (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).

"Protected activity under the False Claims Act's anti-retaliation provision takes two forms." *Singletary*, 939 F.3d at 295.   The first form of protected activity is "lawful acts done . . . in furtherance of an action under this section," 31 U.S.C. § 3730(h)(1)—in other words, "steps taken antecedent to a False Claims Act proceeding," *Singletary*, 939 F.3d at 295.   An employee engages in such activity by "'investigat[ing] matters that reasonably could lead to,' or have a 'distinct possibility' of leading to, a 'viable False Claims Act case.'" *Id.* (quoting *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 66, 68-69 (D.C. Cir. 2008)).   The second form of protected activity is "lawful acts done in furtherance of 'other efforts to stop 1 or more violations of' the [Act]." *Singletary*, 939 F.3d at 295 (quoting 31 U.S.C. § 3730(h)(1)).   "To put it simply, the focus of the second prong is preventative—stopping 'violations'—while the first prong is reactive to an (alleged) actual violation of the statute." *Id.* at 296.

With the additions made in his amended complaint, Mr. Irizarry's alleged protected activity falls into three categories: (1) his investigation of ITI's SCA violations and the statements he made

to Mr. Martinez about the results and consequences of that investigation; (2) his refusal to organize or participate in the meeting with ITI's subcontractors; and (3) his initial interactions with Investigator Yasin, which followed Mr. Martinez's instruction not to speak to him and were observed by Mr. Martinez. *See* ECF No. 56, at 13-16. The court addresses each in turn.

### A.    Investigation and Related Comments

Investigating a matter that could lead to a viable False Claims Act case is a protected activity. *Singletary*, 939 F.3d at 295. But "[c]ommon sense teaches that an employer cannot retaliate against conduct of which [he] was unaware." *Id.* at 300. Thus, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)). To overcome this presumption, a plaintiff must show that he "act[ed] outside his normal job responsibilities or alert[ed] a party outside the usual chain of command." *Martin-Baker Aircraft Co.*, 389 F.3d at 1261.

In his previous complaint, Mr. Irizarry alleged that his normal job duties did not include investigations of compliance with laws or regulations, and that his position merely required him to oversee the implementation and completion of ITI's contracts. ECF No. 58, at 8. However, this was not enough to persuade the court that Mr. Irizarry was not "merely acting in accordance with [his] employment obligations," *Martin-Baker Aircraft Co.*, 389 F.3d at 1261 (quoting *Yuhasz*, 341 F.3d at 568), because Mr. Irizarry had undertaken the investigation of ITI only after Mr. Martinez ordered him to do so, ECF No. 58, at 9. As the court previously determined,

"Mr. Martinez made the SCA investigation part of Mr. Irizarry's job responsibilities by asking him to conduct it." *Id.*

Mr. Irizarry now attempts to bolster his retaliation claim by adding allegations that "ITI did not hire or assign [him] . . . responsibility for performing legal compliance investigations for any of the DOD contracts as part of his job duties and responsibilities, and ITI never tasked [him] with performing legal compliance investigations," and that he "was not ITI's designated compliance officer, and ITI did not hire him to perform or instruct him to perform[] an[y] legal and/or compliance investigations as part of his regular job duties and responsibilities." ECF No. 59-1 ¶¶ 11, 13.

These allegations have the same problems as those in Mr. Irizarry's first amended complaint. Because Mr. Irizarry only investigated the SCA violations after Mr. Martinez ordered him to do so—in other words, after Mr. Martinez made the investigation part of Mr. Irizarry's job duties—and because Mr. Irizarry did not "alert a party outside the usual chain of command" about the findings of his investigation, he cannot "'overcome the presumption that [he was] merely acting in accordance with [his] employment obligations'" when he undertook his investigation of ITI's SCA violations. *Martin-Baker Aircraft Co.*, 389 F.3d at 1261 (quoting *Yuhasz*, 341 F.3d at 568).[3]

As for comments that Mr. Irizarry made to Mr. Martinez requesting that he hire an attorney to complete the investigation and urging that he refund wrongfully withheld payments to the government, the court previously concluded that these conversations did not amount to protected activity. ECF No. 58, at 9-10. The court noted that these interactions were "the natural result of

---

[3] To the extent that Mr. Irizarry adds allegations about conversations he had with Investigator Yasin *after* he resigned, they cannot possibly support his contention that he engaged in a protected activity *during* his employment. Accordingly, they cannot support a claim of retaliation.

Mr. Martinez's order that Mr. Irizarry investigate ITI's SCA violations," and it reasoned that "'[m]erely warning the defendants of the consequences of their conduct,' as Mr. Irizarry did here, did not necessarily put Defendants on notice that he 'was furthering or intending to further an FCA action'"—particularly because Mr. Irizarry did not report his concerns outside his chain of command.  ECF No. 58, at 9-10 (quoting *Yuhasz*, 341 F.3d at 567).

Mr. Irizarry's amendments adding other instances of similar conversations are futile for the same reason.  For example, Mr. Irizarry now alleges that, in addition to the statements detailed in his previous complaint, he also told Mr. Martinez that "misleading Investigator Yasin was not a good idea" and pointed to the example of President Nixon, stating "the cover up is worse than the crime" and that Mr. Martinez should "not do it."  ECF No. 59-1 ¶ 109-11.  Mr. Irizarry also adds details regarding a conversation in which he told Mr. Martinez that "Contract Manager Vincent Langan or HR Manager Beth Carroll would be better suited for [the] investigation as Mr. Langan was more familiar with the contracts and Ms. Carroll was responsible for preparing employees' salaries for the audit."  *Id.* ¶ 77.

These new allegations are insufficient for the same reasons as the old ones.  Mr. Irizarry's statements to Mr. Martinez discouraging him from lying to Investigator Yasin are "mere[] warning[s] . . . [regarding] the consequences of [his] conduct" that the court cannot infer put Mr. Martinez on notice.  *Yuhasz*, 341 F.3d at 567.  And Mr. Irizarry's exhortation that the investigation be delegated to Mr. Langan or Ms. Carroll does not qualify as protected activity for the same reason as his plea to Mr. Martinez to hire an attorney to complete the investigation: the request was a natural outgrowth of Mr. Martinez's assignment of the investigation to Mr. Irizarry and therefore could not have indicated to Mr. Martinez or ITI that Mr. Irizarry "was furthering or

intending to further an FCA action." *Id.* (quoting *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996)).

### B.    Refusal to Participate in the Subcontractor Meeting

In his amended complaint, Mr. Irizarry also alleged that he had engaged in protected activity when he refused to conduct a meeting with two of ITI's subcontractors, Aerotek and MSI, and told Mr. Martinez that "he felt . . . [the] meeting was an attempt to hide, rather than correct, any past SCA violations."  ECF No. 20-1 ¶ 87.  Mr. Irizarry now adds that he also informed Mr. Martinez that he believed such a meeting would "interfere with DOL's investigation" and, in response, Mr. Martinez instructed him to disguise the meeting as an ordinary business meeting. ECF No. 59-1 ¶ 93.

As the court previously explained, "[w]ith rare exception, the mere refusal to participate in an allegedly unlawful scheme is neither an 'act[] done' nor an 'effort[]' taken, and such forbearance certainly does not equate with the kind of affirmative activity that the text of the [FCA] conveys." *United States ex rel. Tran v. Computer Sciences Corp.*, 53 F. Supp. 3d 104, 136 (D.D.C. 2014).  Mr. Irizarry suggests now, as he did previously, *see* ECF No. 56, at 14, that "any one action [he] engaged in to stop or not participate in the fraud[] cannot be viewed in isolation; . . . [rather,] the court ought to look at all of the relator's actions, cumulatively and holistically, to determine whether the Relator engaged in protected activity," ECF No. 59, at 8. But, as previously described, the actions that Mr. Irizarry describes could not have put his employer on notice that he was engaging in protected activity.  *See supra* pp. 11-13; ECF No. 58, at 11.  As the court previously pointed out, and as Mr. Irizarry fails to contest, in the relevant cases regarding refusal to participate in unlawful activity, the "relator took some *other* action—in

addition to refusing to participate in allegedly unlawful activity—that could independently support a retaliation claim." ECF No. 58, at 11. Mr. Irizarry took no such action here. *Id.* at 11.

### C.    Interaction with Investigator Yasin

Finally, Mr. Irizarry adds new allegations that during a June 7 meeting between Mr. Martinez and several employees, Mr. Martinez instructed the attendees not to speak with Investigator Yasin directly. ECF No. 59-1 ¶ 90. Mr. Irizarry further alleges that on June 11, he "spoke and exchanged contact information" with Investigator Yasin, and that "[Mr.] Martinez observed this interaction." *Id.* ¶ 107. Afterward, Mr. Martinez and Mr. Irizarry had a conversation during which Mr. Irizarry told Mr. Martinez that "misleading Investigator Yasin was not a good idea" and, in response to Mr. Martinez's explanation of how he would evade DOL's investigation, referred to the Watergate scandal and told Mr. Martinez that "the cover up is worse than the crime" and that he should "not do it." *Id.* ¶ 111. At the conclusion of the conversation, Mr. Martinez instructed Mr. Irizarry "to meet him in his office at 5:00 p.m." *Id.* ¶ 112.

Once again, these allegations fall short of suggesting that Mr. Irizarry's employer was on notice that he was engaging in a protected activity. To begin, while Mr. Irizarry alleges that Mr. Martinez saw the interaction in which he exchanged contact information with Investigator Yasin, he does not allege that Mr. Martinez *heard* the conversation, nor does he offer any detail that might suggest that Mr. Martinez was aware of the content of the conversation with Investigator Yasin. And while it is true that having any conversation with Investigator Yasin contradicted Mr. Martinez's instruction to his employees, Mr. Irizarry does not report that Mr. Martinez chastised him for speaking to the investigator, nor does he allege that Mr. Martinez treated him with suspicion after observing the interaction. To the contrary, Mr. Martinez offered Mr. Irizarry more details regarding his planned cover-up in their later discussion. *Id.* ¶ 110. These

facts do not give rise to an inference that Mr. Martinez suspected that Mr. Irizarry was engaging in protected activity.  Nor does Mr. Martinez's request to meet with Mr. Irizarry following his interaction with Investigator Yasin suggest that Mr. Martinez believed that Mr. Irizarry was engaged in any protected activity; indeed, Mr. Irizarry himself explains that the meeting was set so that the pair could discuss the subcontractor meeting, not because of Mr. Irizarry's interaction with Investigator Yasin.  *Id.* ¶ 116.

*    *    *

Thus, even with all inferences drawn in his favor, Mr. Irizarry's new allegations do not plausibly state a claim for whistleblower retaliation.  Because none of Mr. Irizarry's proposed amendments would allow his retaliation claim to survive a motion to dismiss, the court determines that amendment would be futile.

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Relator's Motion for Leave to Amend the Amended Complaint, ECF No. 59 is **DENIED**.  Counts IV and V of Relator's Amended Complaint, ECF No. 20, and the United States' Complaint in Partial Intervention, ECF No. 40, remain before the court.  The court will schedule an Initial Scheduling Conference forthwith.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   August 8, 2025